FILED

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

2005 JAN -4  P 4: 07

ROBERT WORSTER            :
          Plaintiff       :
v.                        :      3:02CV167 (EBB)  DISTRICT COURT
                          :
CARLSON WAGON LIT TRAVEL, INC.  :
          Defendant       :


MEMORANDUM OF DECISION ON
MOTION FOR SUMMARY JUDGMENT

The plaintiff Robert Worster has sued his former employer

Carlson Wagonlit Travel, Inc. (hereinafter "Defendant" or

"Carlson") under the Americans with Disabilities Act ("ADA"), 42

U.S.C. § 12101, et.seq., as amended by the Civil Rights Act of

1991, the Connecticut Fair Employment Practices Act ("CFEPA"),

Conn. Gen. Stat. §46a-60, and the federal Family and Medical

Leave Act (FMLA), 29 U.S.C. § 2611 et. seq.  Specifically, the

plaintiff alleges that his former employer discriminated against

him as a result of his alleged disability and his use of FMLA

leave and retaliated against him as a result of his opposition to

the alleged discrimination and his exercise of rights under the

FMLA.  Additionally, the plaintiff has brought a state law claim

for negligent infliction of emotional distress.  The defendant

has moved for summary judgment on all counts.

**Statement of Facts**

The Court sets forth only those facts deemed necessary to an

understanding of the issues raised in, and decision rendered on,

1

this Motion. The facts are distilled from the Complaint, the parties memoranda of law and exhibits thereto, and the parties' Local Rule 56 Statements.

The plaintiff began working for Carlson in 1988 in the Carlson ticketing department. In 1995, Mr. Worster was laid off due to a reduction in force. He was recalled in 1997 to work in the Meeting Services Department as a "group air reservationist". In January of 1999, he was promoted to lead travel counselor and then again, in October 1999, to meeting planner.

In early 1999, the plaintiff was diagnosed with Lyme disease and experienced various physical symptoms, including recurring head aches and fatigue, and absences from work.

In approximately July 1999, Wayne Fischer became the plaintiff's immediate supervisor. In October 1999, plaintiff was hospitalized for one week. In early November 1999, plaintiff and a co-worker, Kim Mascone, were reassigned to another department to help answer and service incoming calls to the call center for "the Pearson account." When reassigned to the Pearson account, plaintiff's duties involved fielding phone calls and taking and placing travel reservations for the clients' employees. By contrast, as a meeting planner, Mr. Worster had worked one on one with a group, planning all of the group's travel arrangements. Plaintiff's pay was not reduced while assigned to the Pearson account and he does not claim that he was demoted or lost his

title.  On November 24, 1999 and again on January 6, 2000,

Fischer informed both Worster and Mascone that the loan of their

services would be extended in the Pearson account.

On November 29, 2000, Fischer gave Worster a formal warning

as a result of several absences and indicated that the next step

would be further disciplinary action up to and including

termination.  Subsequently, on December 7, 1999, the plaintiff

produced a Certification of Physician and a formal request for

intermittent leave pursuant to the FMLA.  Plaintiff requested the

intermittent leave as an accommodation to his alleged physical

disability.  According to Mr. Worster's physician, he was unable

to work when he was feeling intense fatigue and would need to

arrive late or leave early as a result of the fatigue. Carlson

granted the leave prospectively, as well as retroactively to

August 1999, and kept plaintiff in the position servicing the

Pearson account.  Carlson stated that the position in the Pearson

account was more flexible, and therefore, more appropriate given

plaintiff's intermittent leave.  Under the intermittent leave

granted, plaintiff had the right "when fatigued" to take days

off, come in late or leave early, without suffering disciplinary

action. Along with approval of the leave, the November 29, 1999

disciplinary warning was removed from Mr. Worster's personnel

file.

On or about January 28, 2000, the plaintiff met with his

supervisor Fischer and two representatives of Human Resources, Jo
Ann House and Joan Garrett (who participated by phone).
Plaintiff stated that he was unhappy with his schedule working on
the Pearson account and wanted a fixed schedule.   Fischer told
plaintiff in the presence of the Human Resources representatives
that he was not willing to return him to group responsibilities
in light of his attendance.   ("I can't count on you being at work
because of your medical condition.") At the meeting, Ms. Garrett
made clear to Fischer that these comments were inappropriate.
Carlson denied the plaintiff's request to return him to his
former position on the basis that the position in the Pearson
account afforded Carlson more flexibility to accommodate Mr.
Worster's intermittent leave.

On January 28, 2000, Mr. Worster filed a complaint with the
Commission on Human Rights and Opportunities (CHRO) and the Equal
Employment Opportunity Commission (EEOC) alleging that Carlson
was discriminating against him because of his status as a person
with a disability in violation of the federal and state
antidiscrimination laws. In February 2000, House informed Mr.
Worster that in order to meet his accommodation request, Carlson
would keep him on the Pearson account until he could return to
the Meeting Department full time.

While the plaintiff was on intermittent leave, Carlson
learned that he was working a second job at a restaurant.   By

4

letter dated March 16, 2000, Carlson informed Mr. Worster:

> If illness-related fatigue is aggravated by the fact you are
> working a secondary job, and could be avoided by
> relinquishing the secondary job, than [sic] Carlson's
> obligation to accommodate you is similarly eliminated.
> While we are not requesting at this time a relinquishment of
> the secondary job as a condition to retaining your leave
> rights, we will monitor attendance and the impact on
> attendance caused by the secondary job.

House testified that she spoke with plaintiff regarding the

second job, and that her understanding was that plaintiff had

reduced his work at the restaurant to one shift a week and would

be quitting soon.

On March 17, 2000, the plaintiff learned that he was HIV

positive.  By letter dated May 5, 2000, the plaintiff requested a

full-time personal leave of absence to extend from May 15, 2000

through the summer, ending September 18, 2000.  By letter dated

May 9, 2000, Carlson confirmed that the leave was for non-medical

reasons and that, pursuant to plaintiff's request, the Company

would grant a renewable personal unpaid leave of 30 days.

Around this time, plaintiff spoke with Ms. House regarding

the option for a paid medical leave of absence, under which he

would be eligible for salary continuation and continuation of

company-paid benefits.  Plaintiff elected to revoke his request

for personal leave and instead made a request for FMLA leave.  He

submitted his request and provided Ms. House with a Certification

of Physician stating that he had been diagnosed as HIV-positive

and that he was presently incapacitated as a result of "extreme

fatigue."  Carlson's FMLA leave policy allowed for 100 percent payment for the first 268.50 hours of FMLA leave and thereafter 50 percent of pay for the remaining leave under the policy. Plaintiff's leave began on May 12, 2000 and would expire on July 6, 2000 at which time plaintiff could submit a request to extend the leave.

On May 18, 2000, pursuant to his new request for FMLA leave, plaintiff signed a document entitled "Notice to Employee of Rights and Obligations Under the Family and Medical leave Act". Paragraph 17 of this document provided as follows:

> You must not engage in gainful employment during FMLOA. Noncompliance with this restsriction, or fraud in obtaining a FMLOA will result in termination of employment in addition to other rights of the company if that occurs (including potential recovery of the Company's share of health or dental premiums during FMLOA to the extent not prohibited by law.

While on leave and unbeknownst to Carlson, plaintiff relocated to Cape Cod where he took a job at a restaurant called Chesters.  By letter dated June 28, 2000 and a subsequent note dated July 6, 2000, Mr. Worster sought to renew his medical leave.  Carlson informed him that he would need to present certification from his doctor for continued medical leave. During the week of July 16, 2000, defendant received an anonymous fax, that appeared to be from a Carlson employee, stating that plaintiff was working at Chesters in Provincetown, Cape Cod.  On July 18, 2000, Ms. House made a phone call to the restaurant and

was told that Mr. Worster was expected in around 4:30.  On July 19, 2000, Ms. Garrett telephoned Chesters and this call also confirmed that a Robert Worster was employed there.

While defendant was investigating whether the plaintiff was gainfully employed while on leave, the plaintiff attempted to contact Carlson regarding the extension of his FMLA leave and paid benefits.  On July 19, 2000, plaintiff telephoned defendant regarding the request for extending his leave.  He stated that "that is my income.  I am a sick person, ..."

In the meantime, there were ongoing settlement discussions to settle the plaintiff's CHRO complaint filed in February 2000. One of the four conditions for settlement proposed by the plaintiff was that Carlson "waive all legal actions for benefits/wages collected during employment."  On or around July 24, 2000 Ms. Garrett spoke with Tom Brainerd of the CHRO regarding the proposed settlement.  Ms. Garrett informed Mr. Brainerd that Carlson rejected the proposed settlement.  On July 25, 2000, Ms. Garrett sent Mr. Worster a letter to his Provincetown work address, informing him that Carlson was terminating his employment.  In this letter, Ms. Garrett informed Mr. Worster that Carlson believed that he had deceitfully obtained his FMLA leave and threatened to sue him for recovery of benefits.

On or around August 21, 2000, the plaintiff filed a second

7

administrative charge, alleging retaliation for opposing
discriminatory conduct and additional claims of disability
discrimination.  This litigation followed.

### The Standard of Review

In a motion for summary judgment the burden is on the moving
party to establish that there are no genuine issues of material
fact in dispute and that it is entitled to judgment as a matter
of law. Fed.R.Civ.P. 56(c).  *See also* <u>Anderson v. Liberty Lobby</u>,
477 U.S. 242, 256 (1986) (plaintiff must present affirmative
evidence in order to defeat a properly supported motion for
summary judgment). Although the moving party has the initial
burden of establishing that no factual issues exist, "[o]nce that
burden is met, the opposing party must set forth specific facts
demonstrating that there is a genuine issue for trial."
<u>Sylvestre v. United States</u>, 771 F.Supp. 515, 516 (D.Conn.1990).

If the nonmoving party has failed to make a sufficient
showing on an essential element of his case with respect to which
he has the burden of proof at trial, then summary judgment is
appropriate.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).
"In such a situation, there can be 'no genuine issue as to any
material fact,' since a complete failure of proof concerning an
essential element of the nonmoving party's case necessarily
renders all other facts immaterial." <u>Id</u>. at 322-23.  In this
regard, mere assertions and conclusions of the party opposing

8

summary judgment are not enough to defend a well-pleaded motion. Lamontagne v. E.I. DuPont de Nemours & Co., 834 F.Supp 576, 580 (D.Conn.1993), aff'd 41 F.3d 846 (2d Cir.1994).

The court is mandated to "resolve all ambiguities and draw all inferences in favor of the nonmoving party...." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d. 520, 523 (2d Cir.), cert. denied, 506 U.S. 965 (1992). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991). If the nonmoving party submits evidence which is "merely colorable", or is not "significantly probative," summary judgment may be granted. Anderson, 477 U.S. at 249-52 (scintilla of evidence in support of plaintiff's position insufficient; there must be evidence from which a jury could reasonably find in his favor). See also, Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000).

The Second Circuit has held that summary judgment is appropriate in certain discrimination cases, regardless that such cases may involve state of mind or intent. "The summary judgment rule would be rendered sterile, however, if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion. Indeed, the salutary purposes of summary judgment--avoiding protracted, expensive and harassing trials--apply no less to discrimination cases than to commercial

9

or other areas of litigation." <u>Meiri v. Dacon</u>, 759 F.2d 989, 998
(2d Cir.1985).

"[T]he mere existence of some alleged factual dispute
between the parties will not defeat an otherwise properly
supported motion for summary judgment; the requirement is that
there be no genuine issue of material fact. As to materiality,
the substantive law will identify which facts are material. Only
disputes over facts that might affect the outcome of the suit
under the governing law will properly preclude the entry of
summary judgment.  Factual disputes that are irrelevant or
unnecessary will not be counted." <u>Anderson</u>, 477 U.S. at 247-48
(emphasis in original).

***Discussion***

**FIRST COUNT**      ***Discrimination Under  ADA***

    ***Statutory Framework***

The Plaintiff first brings a claim for discrimination based
on physical disability under the Americans with Disabilities Act
("ADA"), 42 U.S.C. § 12101 *et seq.*  Specifically, Mr. Worster
claims that the defendant discriminated against him by
"disciplining, demoting, and terminating his employment."  The
plaintiff's ADA claim appears to be that the defendant
discriminated against him on the basis of his alleged disability,

HIV positive status, when it terminated his employment.[1]

Section 42 U.S.C. § 12112(a) of the ADA states in pertinent part: "No covered entity shall discriminate against a qualified individual because of the disability of such individual in regard to ... discharge of employees, employee compensation ... and other terms, conditions, and privileges of employment." Discrimination claims under the ADA are analyzed using the framework developed under Title VII. *See* <u>Bonura v. Sears Roebuck & Co.</u>, 62 Fed.Appx. 399, 399 n. 4 (2d Cir.2003). Under the framework of <u>McDonnell Douglas Corp. V. Green</u>, 411 U.S. 792 (1973), the plaintiff must first establish a prima facie case of discrimination. This requires that "the claimant ... show that: 1) he belonged to a protected class; 2) he was qualified for the position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." <u>Terry v. Ashcroft</u>, 336 F.3d 128, 138 (2d Cir.2003).

The plaintiff's burden at the prima facie stage is de minimis. *See* <u>Dister v. Continental Group, Inc.</u>, 859 F.2d 1108, 1114 (2d Cir.1988). "Once a plaintiff has established a prima

---

[1] The plaintiff's CFEPA claim, on the other hand, appears to be that (1) Carlson discriminated against him on the basis of his alleged disability Lyme disease when it (a) transferred him to the Pearson account in November 1999 and (b) refused to return him to his former position in early 2000; and also that (2) Carlson discriminated against him on the basis of his alleged disability HIV positive status when it terminated his employment.

facie case, the burden shifts to the defendant, which is required
to offer a legitimate, non-discriminatory rationale for its
actions." Terry, supra at 138. Finally, "if the defendant
proffers such a [legitimate, nondiscriminatory] reason, the
presumption of discrimination created by the prima facie case
drops out of the analysis, and the defendant will be entitled to
summary judgment ... unless the plaintiff can point to evidence
that reasonably supports a finding of prohibited
discrimination.... The plaintiff must be afforded the opportunity
to prove by a preponderance of the evidence that the legitimate
reasons offered by the defendant were not its true reasons but
were a pretext for discrimination." Mario v. P & C Food Markets,
Inc., 313 F.3d 758, 767 (2d Cir.2002) (internal quotation marks
and citations omitted). In other words, "to defeat summary
judgment ... the plaintiff's admissible evidence must show
circumstances that would be sufficient to permit a rational
finder of fact to infer that the defendant's employment decision
was more likely than not based in whole or in part on
discrimination." Terry, 336 F.3d at 138 (internal quotation marks
omitted). Applying these principles and finding no material facts
in dispute, the court concludes that summary judgment should be
granted in favor of Carlson on the ADA claim.

The ADA protects "qualified individual[s] with a disability"
from discrimination. 42 U.S.C. § 12112(a). "A 'qualified

12

individual with a disability' is identified as 'an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" <u>Sutton v. United Air Lines, Inc.</u>, 527 U.S. 471, 478 (quoting 42 § U.S.C. 12111(8)). The ADA defines a disability, in relevant part, as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (B) a record of such impairment; or (C) being regarded as having such an impairment". 29 U.S.C. § 12502(2)(A)-(C)).

The plaintiff's ADA claim is based on alleged discriminatory treatment as a result of the plaintiff's HIV positive status. First, there is a considerable question whether Mr. Worster can establish a prima facie case under the ADA. Additionally, summary judgment is proper because Mr. Worster has failed to present any evidence that would be sufficient to permit a rational finder of fact to infer that the Carlson's legitimate, nondiscriminatory reasons for its actions in terminating Mr. Worster's employment were a pretext for discrimination.

Plaintiff fails to meet his burden of establishing a *prima facie* case of discrimination under the ADA. Mr. Worster contends that HIV positive status constitutes a physical impairment which substantially limited the major life activities of reproduction and sexual activity. First, HIV positive status does not qualify

13

as a matter of law as a per se disability in this Circuit. In
<u>Sutton v. United Airlines</u>, 527 U.S. 471, 482-84 (1999), the
Supreme Court made clear that disability claims must be subjected
to an "individualized inquiry."   The definition of disability
also requires that disabilities be evaluated "with respect to an
individual" and be determined based on whether an impairment
substantially limits the "major life activities of such
individual." § 12102(2). Thus, whether a person has a disability
under the ADA is an individualized inquiry. See <u>Bragdon v.</u>
<u>Abbott</u>, 524 U.S. 624, 641-642 (1998) (declining to consider
whether HIV infection is a per se disability under the ADA); 29
CFR pt. 1630, App. § 1630.2(j) ( "The determination of whether an
individual has a disability is not necessarily based on the name
or diagnosis of the impairment the person has, but rather on the
effect of that impairment on the life of the individual"). Under
<u>Sutton</u>, it is not enough for a plaintiff to show simply that he
or she has a certain disease which may "potentially or
hypothetically" be disabling.   <u>Id.</u>  Instead, a plaintiff must
show that his or her impairment, in fact, "substantially limits a
major life activity." See <u>Colwell v. Suffolk County</u>, 158 F.3d
635, 643 (2nd Cir. 1998). A plaintiff's impairment "does not
substantially limit reproduction when [the] [impairment] does not
affect the [plaintiff's] decision of whether to have children."
<u>Sussle v. Sirina Protection Systems Corp.</u>, 269 F.Supp.2d 285, 307

<div align="center">14</div>

(S.D.N.Y. 2003)(*citing* <u>O'Loughlin v. Dominick's Finer Foods</u>, (N.D.Ill. Apr.19, 2001), No. 99 C 8301, 2001 WL 1753500, at *5). In <u>Sussle</u>, a former employee sued his employer under the ADA alleging discrimination and retaliation, contending that his alleged disability, Hepatitis C, substantially limited his ability to reproduce and to engage in sexual activity. The Court concluded that the plaintiff could not demonstrate that his impairment restricted his ability to reproduce, in the absence of any specific evidence that the alleged disability, and not other factors, restricted his ability to reproduce.

In <u>Blanks v. Southwestern Bell</u>, 310 F.3d 398, 401 (5th Cir. 2002), the Fifth Circuit Court of Appeals held that an HIV-positive male who had decided with his wife "not to have any more children and [whose] wife underwent a procedure to prevent her from having any more children" was not disabled within the meaning of the ADA, because reproduction is not a major life activity for *this* individual. *See also* <u>Gutawks v. American Airlines</u>, 1999 WL 1611328, *4 (N.D. Tex. 1999) (denying a claim of disability, noting that while the plaintiff in <u>Bragdon</u> "testified that her HIV status dictated her decision not to have children . . . it is apparent that here reproduction is not a major life activity for Gutawks," who "admits that he does not currently, nor has he ever, desired to father children.")

Plaintiff fails to provide evidence that his alleged

15

disability caused him to be substantially limited in the major life activities of reproduction or sexual activity. For example, plaintiff has failed to provide any evidence of permanent or long term impact on his major life activities of reproduction. Rather, plaintiff has testified that he had no plans to have children. The Court agrees with the defendant that plaintiff is not unable to reproduce, and, that in any event, reproduction, at the time relevant to this Complaint, was not a major life activity for plaintiff. In the absence of any specific evidence that plaintiff's alleged disability, rather than other factors, circumscribed reproduction, the plaintiff has failed to demonstrate that the impairment significantly restricted his ability to reproduce. Sussle, 269 F.Supp.2d at 308. Similarly, plaintiff has testified that his impairment has not effected his sexual activity. To the extent that a jury could infer from his assertions that his HIV positive status restricted his ability to engage in unprotected sex, no reasonable jury could find from the evidence that this restriction rose to the level of a substantial restriction. *See* Id., at 309. Nor has plaintiff shown that his impairment affects any other major life activity. Nor has the plaintiff, with regard to this claim, proffered any evidence that Carlson regarded him as disabled or that he had a record of having a disability.

Because plaintiff cannot meet his prima facie burden under

the ADA, this claim is dismissed.  Even if Mr. Worster could

sustain his burden of putting forth a prima facie case, his claim

under the ADA nevertheless fails for reasons discussed at length

below, i.e., the plaintiff fails to proffer any credible evidence

that Carlson's reason for terminating his employment is

pretextual.

**COUNT TWO**          *Discrimination under CFEPA*

The plaintiff's CFEPA claim appears to be that (1) Carlson

discriminated against him on the basis of his alleged disability,

Lyme disease, when it (a) transferred him to the Pearson account

in November 1999 and (b) refused to return him to his former

position in early 2000; and that (2) Carlson discriminated

against him on the basis of his alleged disability, HIV positive

status, when it terminated his employment.   The Court addresses

each possible claim.

Under CFEPA, it is a discriminatory employment practice to

discharge from employment any individual ... because of the

individual's ... physical disability, including but not limited

to, blindness.  Conn. Gen. Stat. § 46a-60(a)(1).  Discriminatory

claims brought under the CFEPA are construed similarly to that of

ADA claims, with the Connecticut courts reviewing federal

precedent concerning employment discrimination for guidance in

enforcing the CFEPA. Levy v. CHRO, 235 Conn. 96, 103 (1996).

With respect to disability discrimination claims under CFEPA,

17

however, the CFEPA has a far broader definition of "disabled" than the ADA. *See* <u>Beason v. United Technologies Corp.</u>, 337 F.3d 271, 277 (2nd Cir. 7/21/03). The statutory definition of a physically disabled person, for purposes of the CFEPA, is: "any individual who has any chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness, including, but not limited to, epilepsy, deafness or hearing impairment or reliance on a wheelchair or other remedial appliance or device." Conn.Gen.Stat. §46a-51(15).2[2]

### Claim For Discriminatory Animus Based On HIV Positive Status

The first query under the CFEPA is whether the plaintiff suffered from a chronic physical handicap, infirmity or impairment. The plaintiff claims that his HIV-positive status is sufficient under CFEPA to constitute a "chronic physical handicap, infirmity or impairment ..." section 46a-51(15). Defendant argues that, even under the broader protection of the CFEPA, plaintiff's HIV positive status does not constitute a "handicap" or "infirmity" or "impairment". In particular, defendant argues that, since the plaintiff was able to "take [his] medications such that [he] is not chronically handicapped, infirm, or impaired," he is therefore not disabled under the

---

[2]While the CFEPA definition of disability is broader than that of the ADA, the CFEPA provides no cause of action for perceived physical disability. *See* <u>Beason v. United Technologies Corp.</u>, 337 F.3d 271, 279-82 (2nd Cir. 2003).

18