CFEPA. In support of this argument, Carlson puts forth testimony of plaintiff's treating physician, Dr. Diekhaus, that plaintiff is in the asymptomatic stage with only non-debilitating intermittent "mild fatigue" and "relatively minor issues, mainly dermatologic." Specifically, Dr. Diekhaus testified that from April 2000 to January 2001, Mr. Worster had been "referred to the Yale Aids program for participation in a clinical trial and was started on antiretroviral therapy, that he received reports from the trial group that Mr. Worster had responded well and was taking his medications that his laboratory tests looked very good." When Dr. Diekhaus saw plaintiff next in January, 2001, plaintiff "noted nearly complete resolution of his symptoms". Carlson asserts, therefore, that Mr. Worster was no longer disabled by fatigue by the time he began working at Chesters.

However, even were the Court to conclude, on the record before it, that plaintiff is protected under the CFEPA, he still must prove that Carlson's legitimate non-discriminatory reason for the termination of his employment was pretextual. Defendant claims that plaintiff's employment was terminated because he misrepresented his need for medical leave by exaggerating the extent of his HIV-related fatigue in order to obtain salary-and-benefit continuation which was available under Carlson's FMLA policy, but not under the personal leave policy. Carlson claims

19

that Mr. Worster represented to it that he was unable to work due to extreme fatigue associated with his alleged disability. Carlson approved FMLA leave for Mr. Worster on the basis that he was too ill to work, only to learn that Mr. Worster was apparently well enough to relocate to Cape Cod for the summer and work in a restaurant there. Furthermore, Carlson complains that Mr. Worster sought to renew the leave even while he was well enough to work a restaurant job.

Additionally, Carlson justified its termination of the plaintiff's employment on the basis that Mr. Worster violated the Company's FMLA leave policy forbidding gainful employment during an employee's family and medical leave of absence when he took a job at a restaurant while on paid leave. Under the defendant's FMLA policy, taking on gainful employment during the leave was grounds alone for Mr. Worster's termination. Paragraph 17 of the FMLA Rights and Obligations, the provision which expressly prohibits "gainful employment during FMLOA", provides that, in the event of non-compliance, the company may seek "recovery of the company's share of health or dental insurance premiums [paid] during FMLOA." In light of this provision, the defendant points to plaintiff's proposed condition to settle his first CHRO claim-that the defendant waive its right to seek recovery of past wages and benefits paid.

Mr. Worster argues that Carlson's decision to terminate the

20

plaintiff's employment relies on a policy that it previously chose not to enforce. The plaintiff's argument is that the fact that Carlson did not require him to give up a secondary job while he was on intermittent leave is sufficient to show that Carlson's legitimate reason for terminating his employment was pretextual. The Court is not persuaded. In its March 16, 2000 letter to the plaintiff, Carlson put the plaintiff on notice that "[w]hile we are not requesting at this time a relinquishment of the secondary job as a condition to retaining your leave rights, we will monitor your attendance and the impact on attendance caused by the secondary job." This letter was written with regard to the plaintiff's intermittent leave which commenced in 1999 and by its very terms is inapplicable to an FMLA leave of absence. In 2000, the plaintiff sought and was approved for an FMLA leave of absence. In order to obtain such leave, the plaintiff agreed that he would not engage in gainful employment. The plaintiff's employment was terminated only after the defendant learned and confirmed that the plaintiff had violated the Company's FMLA policy.

Plaintiff can point to nothing in the record that defendant's decision to terminate his employment after Carlson discovered his employment at Chester's in violation of paragraph 17 is pretextual. Carlson's generosity toward the plaintiff when he was on intermittent leave does not preclude it from enforcing

21

its FMLA policy during a fully paid leave of absence. To the extent that the plaintiff argues that Carlson did not uniformly enforce its policy, the proper evidence to bring forth would be if Carlson knowingly allowed other employees to take a paid leave of absence while working a second job, not the Company's past generosity toward the plaintiff in a separate and distinct intermittent leave.

Because Mr. Worster fails to proffer credible evidence that Carlson's legitimate reason for terminating his employment was pretextual, summary judgment is granted as to the CFEPA discriminatory discharge claim.

### The Lyme Disease Claims

Plaintiff further claims that he was discriminated against under the CFEPA when Carlson transferred him to the Pearson account in November 1999 and then again in January 2000 when Carlson refused to rescind the transfer. Underlying this claim, is plaintiff's contention that Lyme disease is a chronic physical impairment for purposes of bringing a CFEPA claim. As support for this contention, the plaintiff claims that he suffered from recurring headaches and fatigue that resulted in his need to take an intermittent leave of absence. Even if Lyme disease qualifies as a disability under the CFEPA, which is questionable, the Court cannot conclude that either the transfer or the refusal to rescind the transfer qualifies as an adverse action to meet

22

the plaintiff's *prima facie* burden.

Turning to Mr. Worster's allegation that his transfer was an adverse action, the Court doubts whether the transfer rises to the level of an adverse action. Transfers that do not result in a demotion through loss of pay, rank, title or significant job responsibilities do not ordinarily constitute adverse actions. *See* Galabya v. New York City Bd. Of Educ., 202 F.3d 636, 641 (2d Cir.2000) ("[A] transfer is an adverse employment action if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career.") However, "an involuntary transfer may constitute an adverse employment action if the plaintiff show[s] that the transfer created a materially significant disadvantage with respect to the terms of [his] employment." Williams v. R.H. Donnelley Corp., 368 F.3d 123, 128 (2d Cir. 2004). Here, there is no evidence that assignment to the Pearson account materially disadvantaged the terms of Mr. Worster's employment. While the plaintiff charges that he was dissatisfied with the transfer and argues that the Pearson account position was less flexible and a lower level position, he does not claim that he suffered a loss of pay, rank or title. While his responsibilities changed from working one-on-one with a group to being one of a pool servicing a group, the transfer was a temporary one and plaintiff admitted at his deposition that it was for business reasons. Plaintiff admitted in his sworn

23

testimony that the transfer occurred when "there was an increase in the corporate travel business and, as a result of that, it was necessary to pull [him] to the Pearson account, and subsequently Kim Mascone for the same reason was pulled to the Pearson account." "[I]t is not the function of a fact-finder to second-guess business decisions.... A business decision need not be good or even wise. It simply has to be nondiscriminatory.... Thus, the reasons tendered need not be well-advised, but merely truthful." Dister v. Continental Group, Inc., 859 F.2d 1108, 1116 (2d Cir.1988). The Court further notes that the loan of both Mr. Worster and Ms. Mascone to the Pearson account was extended into January 2000.

Similarly, Carlson's decision not to rescind Mr. Worster's transfer after the January meeting does not rise to the level of an adverse action. In any event, Ms. Garrett testified that the decision to keep Mr. Worster on the Pearson account was an accommodation to his request for intermittent leave.[3] Specifically, Ms. Garrett testified that the Pearson account afforded more flexibility to accommodate the plaintiff's intermittent leave request. It is credible that, for business planning purposes, Carlson would prefer to have Mr. Worster

---

[3] While the plaintiff asserts that a transfer to an alternative position is not proper under the FMLA, the plaintiff's transfer occurred prior to the plaintiff's request for FMLA intermittent leave. The plaintiff has presented no evidence that the defendant was obligated under the FMLA to return the plaintiff to his former position once he requested intermittent leave. Nor would the Court so conclude on the record before it.

24

performing duties in a position where it would have backup to the extent the Mr. Worster was using intermittent leave. Indeed, it is well established that "Employers need a certain amount of flexibility to organize their companies efficiently, and courts should hesitate before second-guessing their day-to-day personnel decisions." Bruno v. Sonalysts, Inc., 2004 WL 2713239, *5 (D.Conn.) (citations omitted).

The Court concludes that neither the transfer to the Pearson account nor Carlson's refusal to rescind the transfer in early 2000 are adverse events, and that, even if they were, the plaintiff has failed to proffer evidence that Carlson's legitimate reasons to transfer him to the Pearson account or the decision not to rescind the transfer were pretextual. Accordingly, Count II is dismissed in its entirety.

### COUNTS THREE AND FOUR    *The Retaliation Claims*

In order to survive summary judgment on his retaliation claims under the CFEPA and the ADA, Mr. Worster must make a *prima facie* case of retaliation by showing: "[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and adverse employment action." Feingold v. New York, 366 F.3d 138, 156 (2d Cir..2004) (*quoting* Tomka v. Seiler Corp., 66 F.3d 1295, 1308 (2d Cir.1995). Retaliation claims are analyzed in the same manner under the

25

CFEPA. *See* <u>Brittell v. Dep't of Correction</u>, 247 Conn. 148, 163-64, 717 A.2d 1254 (1998) (state anti-discrimination statute is coextensive with the federal statute).

Analogously, to survive summary judgment on his FMLA retaliation claim, Mr. Worster must show that "1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." <u>Potenza v. New York</u>, 365 F.3d 165, 168 (2d Cir.2004).

The <u>McDonnell Douglas</u> burden shifting analysis applies to claims of retaliation under the FMLA, the ADA and the CFEPA. *See* <u>Treglia v. Town of Manlius</u>, 313 F.3d. 713 (2d Cir. 2002) (applying <u>McDonnell Douglas</u> to ADA retaliation claim); <u>Potenza</u>, 365 F.3d at 168 (applying <u>McDonnell Douglas</u> to FMLA retaliation claims). Thus, under the ADA, CFEPA or the FMLA, once Mr. Worster has made a *prima facie* case, the burden shifts to Carlson to provide a legitimate non-discriminatory reason for its action. *See* <u>McDonnell Douglas Corp. V. Green</u>, 411 U.S. 792, 802 (1973). If Carlson provides such a reason, the burden shifts back to Mr. Worster to provide evidence from which a jury could conclude that Carlson's articulated reasons for its actions are false and that the real reason for its actions was retaliation as alleged. <u>Id.</u> at 803.

26

### ADA and CFEPA Retaliation Claims

The Court concludes that the ADA and CFEPA retaliation claims fail as a matter of law as there are no adverse actions other than the termination of the plaintiff's employment, and, in any event, the plaintiff fails to proffer any evidence that the termination was caused by his protected activity or occurred under circumstances giving rise to an inference of discriminatory intent. Mr. Worster asserts that Carlson's decision to discipline, demote and terminate the plaintiff's employment were in violation of the anti-retaliation provisions of the ADA and CFEPA. Specifically, Mr. Worster claims that Carlson retaliated against him by: (1) transferring him to the Pearson account; (2) refusing to rescind the transfer after he was placed on intermittent leave; and (3) terminating his employment.

First, neither the transfer to the Pearson account nor Carlson's decision not to rescind the transfer constitute adverse employment events. Furthermore, the transfer to the Pearson account and Carlson's January 2000[4] refusal to return the plaintiff to his previous position occurred prior to the filing of the CHRO claim and were in fact the basis of the CHRO claim.

Plaintiff alleges that it is enough that the defendant's refusal to end his transfer followed the January meeting and the

---

[4] The defendant reiterated its denial of this request in March of 2000.

27

filing of CHRO complaint closely in time. The undisputed facts show that plaintiff met with his supervisor and HR personnel in late January at which time he complained about his transfer to the Pearson account and requested to be returned to his former position. At this time, Carlson denied his request. Shortly thereafter, plaintiff filed a claim with the CHRO. In a letter dated March 16, 2000, defendant expressly stated to the plaintiff that it would not return him to his former position until he provided documentation from his physician showing that he no longer required intermittent leave. The Court cannot state that refusing the plaintiff's request to return to the Meeting Department amounts to retaliation. The plaintiff had made a request, and the employer was obligated to respond in a timely manner. In any event, Mr. Worster cannot rebut Carlson's legitimate reason for denying the request. Carlson had already granted the plaintiff intermittent leave. In so doing, Carlson stated that, for planning purposes, Mr. Worster's placement in the Pearson account provided the kind of flexibility that accommodated the request for intermittent leave, not available in his prior position. The Company's decision was consistent with this position.

Next, the Court considers whether the termination of employment constitutes retaliation for Mr. Worster's protected activity. While a termination is undisputedly an adverse action,

28

Mr. Worster must nevertheless establish that the termination is causally connected to his protected activity. *See* Galabya v. New York City Bd. Of Educ., 202 F.3d 636, 640 (2d Cir.2000). The plaintiff alleges that the fact that defendant had been contacted to discuss settlement of the CHRO claim the day before the termination of his employment is a sufficient nexus to the termination to establish retaliation. The mere fact that defendant had engaged in settlement discussions the day before the termination is not sufficient to show a causal connection. Furthermore, even if plaintiff can establish a causal connection, Defendant has proffered legitimate business reasons for each of the alleged adverse actions: (1) as to the refusal to rescind transfer, defendant offered that this position allowed it to accommodate plaintiff's FMLA intermediate leave request; and (2) as to termination, defendant was enforcing its own FMLA policy which prohibited covered employees from working second jobs while on covered leave. Plaintiff has not provided any evidence from which a jury could conclude that Carlson's articulated reasons for terminating his employment are false.

Accordingly, the Court grants summary judgment as to Count III.

### FMLA Retaliation Claim

Mr. Worster claims that Carlson interfered with his rights under the FMLA and retaliated against him for taking FMLA leave.

The FMLA, 29 U.S.C. § 2601, et seq., entitles eligible employees to certain leave benefits. Section 2612 provides that an eligible employee shall be entitled to a total of 12 work weeks of leave during any 12- month period, "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The FMLA also prohibits employers from retaliating or discriminating against employees who have exercised rights protected under the FMLA. 29 U.S.C. § 2615(a). "An employer is prohibited from discriminating against employees ... who have used FMLA leave." Bond v. Sterling, 77 F.Supp.2d 300, 302 (N.D.N.Y.1999) (quoting King v. Preferred Technical Group, 166 F.3d 887, 891 (7th Cir.1999) (quoting 29 C.F.R. § 825.220(c))). "Nor may employers use the taking of FMLA leave as a negative factor in employment decisions, such as hiring, promotions or disciplinary actions." Id. (quoting Hodgens v. General Dynamics Corp., 144 F.3d 151, 160 (1st Cir.1998) (quoting 29 C.F.R. § 825.22(c)). As discussed above, claims of retaliation are analyzed according to the McDonnell Douglas burden-shifting framework. See Potenza v. City of New York, 365 F.3d 165, 167 (2d Cir.2004).

The parties do not dispute that Mr. Worster availed himself of the protected rights under the FMLA in two separate leaves, an intermittent leave granted in December of 1999 based on symptoms

his doctor believed to be associated with Lyme disease and a leave of absence in the summer of 2000 based on his condition as a result of his HIV positive status. Plaintiff first complains that, as a result of his taking intermittent leave in December 1999, Carlson retaliated against him by forcing him to remain servicing the Pearson account. Plaintiff next complains that his termination was in retaliation for taking FMLA leave in the summer of 2000.

There is no dispute that Mr. Worster was qualified for the position. The remaining issue with the Court with respect to the FMLA claims is whether Carlson took an adverse employment action against him that was causally connected to his FMLA request. As discussed above, the transfer which occurred prior to the request for leave is not a sufficient basis for an FMLA retaliation claim. The next question is whether Carlson's refusal to rescind Worster's transfer to the Pearson account was a retaliatory act. In support of his claim, Mr. Worster points to his supervisor's statement at the January 2000 meeting that he could not count on the plaintiff as a result of his medical condition and the fact that he was on leave and that Carlson informed Mr. Worster that he would not return to the Meetings Department while on intermittent leave. Carlson readily concedes that Fischer made a connection with his unwillingness to have the plaintiff return to the Meeting Department and the plaintiff's absences and use of

31

FMLA leave. Defendant's Human Resource Director Joan Garrett informed the plaintiff that the Company decided to keep Mr. Worster on the Pearson account because it "provided more flexibility on that account for - where attendance, day-to-day attendance was not as critical, versus in the group-and-meeting department." Plaintiff argues that the fact that "regular attendance" was also "an essential function" of the Pearson account is sufficient to render the Company's decision pretextual. The Court does not agree; the fact that regular attendance is required does not mean that attendance may be less critical in a job where the plaintiff is one of several servicing a group versus just one servicing a group.

Plaintiff next alleges that Carlson terminated his employment in retaliation for taking FMLA leave in the summer of 2000. The termination of Mr. Worster's employment occurred over two months after his request for FMLA. The real dispute here centers on the question of whether Carlson had a legitimate non-discriminatory business reason for terminating Mr. Worster when it did. Carlson contends that this claim must fail because a reasonable jury could not conclude that Worster's leave played a part in Carlson's decision to terminate his employment. Rather, Carlson explains that it terminated Worster's employment because it believed that Mr. Worster had committed a fraud in obtaining paid leave and violated the company's FMLOA policy by obtaining

32

employment in Cape Cod. Viewing the facts in the light most favorable to Mr. Worster, the Court cannot conclude that the termination occurred under circumstances from which one can infer discrimination. Specifically, as discussed at length above, Mr. Worster has proffered no credible evidence that Carlson's reason for terminating his employment is pretextual.

Accordingly, summary judgment is granted as to the plaintiff's FMLA claim.

## COUNT FIVE *Negligent Infliction of Emotional Distress*

Finally, Carlson moves for summary judgment on Worster's claim of negligent infliction of emotional distress ("NIED"). Worster alleges that he suffered emotional distress, anxiety, embarrassment and mental anguish as a result of his termination.

In the employment context, NIED arises only where it is based upon the defendant's unreasonable conduct in the termination process. See Parsons v. United Techs. Corp., 243 Conn. 66, 89, 700 A.2d 655 (1997). The dispositive issue is whether the employer's conduct "was sufficiently wrongful that [it] should have realized that its conduct involved an unreasonable risk of causing emotional distress," which could result in illness or bodily harm. Perodeau v. City of Hartford, 259 Conn. 729, 751, 792 A.2d 752 (2002) (internal quotes and citation omitted). However, the mere termination of employment, even where it is wrongful, is not by itself sufficient to sustain

33

a claim for negligent infliction of emotional distress. See Parsons, 243 Conn. at 88-89, 700 A.2d 655. In other words, firing an employee does not transgress the bounds of socially tolerable behavior.

Here, Worster claims that there is evidence that would permit a jury to find that the Defendant's conduct created an unreasonable risk of emotional harm: 1) if the defendant's conduct was due to unlawful animus based on the Plaintiff's FMLA leave or disability, or in retaliation for his complaints of discrimination, such action would be unreasonable; 2) the manner in which Carlson carried out the termination, including its telephone call to Chester's to confirm his employment there and the fact that the termination letter was sent to plaintiff at Chester's address; 3) Carlson's decision to terminate Worster, thereby cutting off his access to health insurance benefits.

Even when taken in the light most favorable to him, the facts that Worster puts forth would not allow a reasonable jury to infer that Carlson acted egregiously. First, as stated above, plaintiff has offered no evidence of unlawful animus based on the plaintiff's FMLA leave or alleged disability, or in retaliation for his complaints of discrimination. Second, the manner in which Carlson terminated the plaintiff's employment, i.e, Carlson's telephone calls to Chester's to verify the plaintiff's employment and the sending of the termination letter to the

plaintiff at his employer's address, does not rise to the level required to state a claim for emotional distress. Third, inasmuch as Mr. Worster claims that the cutting off of benefits is actionable as NIED, the cutting off of benefits is no different than the mere termination itself, which alone is not enough to state a claim for NIED. In any event, none of these incidents that Worster points to is extreme or outrageous. *See, e.g.*, <u>Miner v. Town of Cheshire</u>, 126 F.Supp.2d 184, 197 (D.Conn.2000) (reasoning that because emotional distress in the workplace is not uncommon, courts do not lightly intervene to impair the exercise of management discretion and have thus attempted to keep a tight rein on the expansion of NIED claims in the employment context, limiting them to instances of unreasonable conduct) (citing cases). Accordingly, summary judgment is granted in favor of Carlson on this claim as well.

**Conclusion**

Plaintiff has failed to set forth any genuine issues of material fact upon which he would bear the burden at trial. As a result, the Defendant's Motion for Summary Judgment [Doc. No. 18] is hereby GRANTED.

IT IS SO ORDERED.

ELLEN BREE BURNS, SENIOR JUDGE
UNITED STATES DISTRICT COURT

Dated at New Haven, Connecticut, this 4re day of January 2005

35