UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROBERT WORSTER, | ) |
| | ) |
| Plaintiff, Defendant-in-Counterclaim, | ) |
| | ) |
| v. | ) Case No.: 302CV167(EBB) |
| | ) |
| CARLSON WAGONLIT TRAVEL, INC., | ) |
| | ) |
| Defendant, Plaintiff-in-Counterclaim. | ) |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR RECONSIDERATION**

A. <u>Plaintiff's Discharge Did not Violate the Family and Medical Leave Act</u>

Plaintiff first argues that Carlson did not have a "uniformly applied" FMLA policy prohibiting secondary employment while on leave, and asserts – based on 29 C.F.R. § 825.312(h) – that Carlson, therefore, may not enforce the agreement plaintiff made when he was granted full-time leave to "not engage in gainful employment" during the leave (quoting paragraph 17 of the Notice of FMLA Rights and Obligations that Plaintiff signed; Exhibit 21 to Carlson's Motion for Summary Judgment [hereinafter, "Notice Agreement"]). Plaintiff argues that the fact he was not prohibited from working a second job while on *intermittent* leave establishes a fatal non-uniformity. This Court has already considered this argument, finding and ruling as follows:

> In 2000, the plaintiff sought and was approved for an FMLA leave of absence. In order to obtain such leave, the plaintiff agreed that he would not engage in gainful employment. The plaintiff's

> employment was terminated only after the defendant learned and confirmed that the plaintiff had violated the Company's FMLA policy.
>
> Plaintiff can point to nothing in the record that defendant's decision to terminate his employment after Carlson discovered his employment at Chester's in violation of paragraph 17 is pretextual. *Carlson's generosity toward the plaintiff when he was on intermittent leave does not preclude it from enforcing its FMLA policy during a fully paid leave of absence.* To the extent that the plaintiff argues that Carlson did not uniformly enforce its policy, the proper evidence to bring forth would be if Carlson knowingly allowed other employees to take a paid leave of absence while working a second job, not the Company's past generosity toward the plaintiff in a *separate and distinct intermittent leave.*

[Memorandum of Decision, pp. 21-22 (emphasis)].

The intermittent leave, as this Court observed, was indeed "separate and distinct." The record shows that Carlson does not impose, as a condition for intermittent leave, a prohibition against working a second job. Worster was not required to sign the Notice Agreement upon being granted intermittent leave. The reason for this is self-evident.

While it would be contrary to the purpose of any *full-time* leave (especially one in which the employer provides pay, as here) to allow an employee to work elsewhere, such purpose does not necessarily apply in the context of intermittent leave. For example, an employee requiring intermittent leave in order to receive periodic, but non-debilitating medical treatments, could still work a pre-existing secondary job in the evening without contravening the need for the intermittent

leave from the primary employer[1]. However, in the situation as occurred here in May of 2000 – where an employee informs of a "serious medical condition" that requires leave on a *full-time* basis – the taking of employment elsewhere would be necessarily at cross purposes; i.e, on requesting such a leave, the employee is necessarily claiming a need to be free of the obligations of employment so as to recover from illness, or to care for family members with serious illness, or to devote time to a newborn or new adoptee. The rationale, in this situation, for prohibiting secondary employment is therefore quite reasonable, particularly where the employer continues to provide salary, as was the case with Carlson. Hence, Carlson only prohibits secondary employment in the full-time leave setting, not in the intermittent leave setting, and hence, Carlson's policy *is* uniformly applied: The policy of second-job prohibition applies only to full-time leave, and that policy was enforced in this instance. As this Court points out, plaintiff's argument fails because there is no evidence Carlson knowingly allowed other employees to work a second job while taking a full-time leave of absence.

In addition, the C.F.R. regulation cited by plaintiff, 29 C.F.R. § 825.312(h), contains a caveat which reads: ". . . *unless* the FMLA leave was fraudulently obtained as in *paragraph (g)* of this section." This paragraph, in turn, reads:

---

[1] Of course, Carlson did express concern – in a letter dated March 16, 2000 (Exhibit 10) – that plaintiff's second job may be aggravating or even causing the fatigue that generated the need for the intermittent leave. Nonetheless, Carlson's "generosity," as this Court put it, in not demanding immediate relinquishment of the second job was based not on an inconsistent application of policy, but because Carlson was then willing to give Worster the benefit of the doubt that the second job was not aggravating his fatigue, particularly in view of Worster's statement that he was only working one shift a week and would be quitting soon. Carlson's MSJ brief, p. 314.

> (g) An employee who fraudulently obtains FMLA leave from an employer is not protected by FMLA's job restoration or maintenance of health benefits provisions.

Carlson has shown clear and unrefuted evidence that the full-time leave granted Mr. Worster was, in fact, fraudulently obtained. See, Carlson's Motion for Summary Judgment brief, at pages 15-24 and 32-33, which points to the testimony from plaintiff's doctor that plaintiff's fatigue had "responded very well" to antiretroviral medication that began in April, and the fact that plaintiff began working 35 hours a week in a restaurant in mid-June. Even in the absence of the information from the doctor just mentioned, it was readily apparent to Carlson at the time that plaintiff had *likely* deceived Carlson as to his need for full-time leave in the first place[2], and had *certainly* deceived Carlson when his request was made, on June 28, for *an extension* of this leave – at which point he had already begun working at the restaurant – and when he then delivered his July 19 voice mail, in which he stated that the salary continuation benefit "is my income, and I am, you know, an ill person."[3]

---

[2] Note that plaintiff initially requested a *personal* leave to run from May 12 through September 18 – i.e., the entire Cape Cod summer season – and only changed his request for an FMLA-medical leave, for a shorter period, upon being advised he would receive salary continuation. He also admitted to having made arrangements at least as early as May to rent a residence on the Cape for the entire summer. See, Carlson's original brief at p. 15.

[3] Additional evidence of his deceit included his requests in the July 19 and 21 letters for a "waiver" of Carlson's right to enforce paragraph 17 of the Notice Agreement, and his apparent misrepresentation to the CCHRO agent, who told Carlson on July 25: "I've never seen Rob, but from what he tells me, he is so severely disabled that he cannot work at all." See, Carlson's original brief at pp. 18-20 and 33.

In addition, the issue of Worster's discharge stands apart from the question of whether he was *otherwise* entitled to FMLA leave rights. The purpose of the FMLA is to grant leave and job-restoration rights to eligible employees. Employees on FMLA leave, however, are not immune from adverse employment actions motivated by any separate, legitimate basis. Geromanos v. Columbia University, 322 F. Supp. 2d 420, 428 (S.D.N.Y. 2004) ("The law is clear that an employee may be terminated while on medical leave, as long as the taking of Family Medical Leave Act leave was not the cause for the termination"). Hence, the real issue is not whether Worster's discharge was proper in light of the regulation cited, but whether it was retaliatory. This Court has correctly ruled on this issue, noting first that claims of retaliation – including FMLA-retaliation claims – are analyzed according to the McDonell-Douglass burden-shifting framework. [Memorandum of Decision, p. 30]. This Court then held:

> Plaintiff next alleges that Carlson terminated his employment in retaliation for taking FMLA leave in the summer of 2000 . . . The real dispute here centers on the question of whether Carlson had a legitimate non-discriminatory business reason for terminating Mr. Worster when it did.
>
> Carlson contends that this claim must fail because a reasonable jury could not conclude that Worster's leave played a part in Carlson's decision to terminate his employment. Rather, Carlson explains that it terminated Worster's employment because it believed Mr. Worster had committed a fraud in obtaining paid leave and violated the Company's FMLOA policy by obtaining employment in Cape Code. Viewing the facts in the light most favorable to Mr. Worster, the Court cannot conclude that the termination occurred under circumstances from which one can infer discrimination. Specifically, as discussed at length above, Mr. Worster had proffered

no credible evidence that Carlson's reason for terminating his employment is pretextual.

[Memorandum of Decision pp. 32 – 33].

B. This Court Applied the Correct Standard for Negligent Infliction of Emotional Distress

While Plaintiff's counsel may be correct that the cause of action for negligent infliction of emotional distress ("NIED") does not require a showing of "extreme and outrageous behavior," this Court nonetheless applied the correct standard for NIED, relying on the leading NIED cases from the Supreme Court of Connecticut, Parsons v. United Technology Corp., 243 Conn. 66, 89, 700 A.2nd 655 (1997) and Perodeau v. City of Harford, 259 Conn. 729, 751, 792 A.2nd 752 (2002), and was correct in dismissing Worster's NIED claim. The elements of this cause of action are correctly set forth by this Court at pages 33 and 34 of the Memorandum of Decision.

The case cited by plaintiff, Olson v. Bristol-Burlington Health District, 2005 W.L. 74092 (Conn. App.), does not change the law regarding NIED in Connecticut. Olson merely applied existing law to a case readily distinguishable from the case at bar. First, Olson was decided on a Rule 12(b)(6) motion to strike the plaintiff's pleaded allegations in her complaint. Second, the facts in Olson, *as alleged*, were genuinely horrific, and presented a genuine claim for NIED:

A0004267.DOC

6

- The plaintiff was a public health nurse who suffered from multiple sclerosis, "a progressive and debilitating disease," which results in "fatigue and severe loss of cognitive functioning."

- The defendant in <u>Olson</u> "was aware of plaintiff's medical condition."

- Plaintiff had committed admitted errors in the course of her nursing duties, as a consequence of her disability. "Upon hearing the plaintiff admit to her employment failings, Checko [the supervisor] falsely accused the plaintiff of intentionally falsifying a student's medical record, intentionally violating standard nursing practices and attempting to conceal her errors."

- "In the course of terminating the plaintiff's employment . . . , Checko unreasonably accused the plaintiff of falsifying records, egregious misconduct and deliberate indifference to the health of students under her care."

- "Checko and other employees of the defendant knew that the plaintiff suffered from multiple sclerosis, and they knew or should have known that the progress of her condition was likely to have affected her work performance."

- "Checko knew or should have known that accusing the plaintiff of willful employment-related misconduct in the course of terminating her employment was likely to cause her severe emotional distress and that the resulting emotional distress was likely to be sufficiently severe to cause physical illness or exacerbate her condition."

- "Finally, the plaintiff alleged that she did, in fact, suffer severe emotional distress as a result of Checko's conduct during the termination process."

<u>Olson</u>, at * 2.

By contrast, in the case at bar, this Court dismissed the NIED claim not at the pleading stage, but only after a period of full discovery, on Carlson's motion for summary judgment, in which the evidence was construed in plaintiff's favor. By contrast also, the facts in the case at bar do not show the type of egregious indifference to a plaintiff as shown by the allegations at issue in <u>Olson</u>.

A0004267.DOC                               7

Worster argues, at page 7 in his brief, that the following conduct by Carlson meets the standard for stating a jury question for NIED:

- "The defendant's decision to inform the plaintiff of his termination via a letter addressed to Chester's Restaurant – a place that Human Resource employees suspected but were not sure he worked and with which the defendant did not have permission to communicate regarding the plaintiff's employment;"

- "The fact that this letter contained accusations of deceitful conduct;"

- "The defendant's failure to send this letter to the plaintiff's home address, where it had sent all prior correspondence;"

- "The elimination of health insurance benefits within two months of learning of his HIV-positive status."

This Court has already substantially addressed these arguments in its opinion, at pages 34-35 of the Memorandum of Decision, and did so using the correct NIED standard, as noted at page 33: "The dispositive issue is whether the employer's conduct 'was sufficiently wrongful that [it] should have realized that its conduct involved an unreasonable risk of causing emotional distress,' which could result in illness or bodily harm." *citing* Perodeau, 259 Conn. at 751. With respect to the first and third arguments by plaintiff listed above, this Court correctly held: "Carlson's telephone calls to Chester's to verify the plaintiff's employment and the sending of the termination letter to the plaintiff at his employer's address does not rise to the level required to state a claim for emotional distress." [Mem. of Dec., pp. 34-35].

It should be noted that Carlson did not, as suggested by plaintiff's brief, "communicate" to Chester's Restaurant in terminating plaintiff. First, Carlson's

A0004267.DOC

8

phone contacts were made anonymously. Second, the letter Carlson sent was mailed *to the plaintiff*, and only utilized the address for Chester's, as it was the only address Carlson had at that point[4]. It was not reasonably foreseeable that anyone else in the restaurant would have opened the letter, which was plainly addressed to "Robert Worster," and have read it (a copy of the letter is attached as Exhibit 30 to Carlson's Motion for Summary Judgment). Plaintiff has not come forward with evidence rebutting these facts, or showing that other persons read the letter or were informed of Worster's termination by Carlson and the reasons therefor.

As to plaintiff's argument that the letter contained "accusations of deceitful conduct," the fact of the matter is that plaintiff *did* engage in deceitful conduct. In view of the overwhelming evidence of such, plaintiff can hardly be heard to claim, in a cause of action for NIED, that he suffered emotional distress based on an accusation of conduct that he, in fact, committed.

As to plaintiff's argument that the termination cut off his health insurance benefits, this Court has already ruled correctly, at page 35 of its ruling: "[I]nasmuch as Mr. Worster claims that the cutting off of benefits is actionable as

---

[4] Of course, plaintiff had been deceiving Carlson as to the fact of his relocation to Cape Cod. See, for example, plaintiff's letter of June 28, 2000 (Exhibit 23), requesting the extension of his medical leave, using his Connecticut address even though plaintiff was already working at the restaurant on Cape Cod by that date. As plaintiff's counsel correctly acknowledges at page 7 of her brief, "all prior correspondence" that summer had been sent to plaintiff's Connecticut address. This was so precisely because Carlson was *unaware* of Worster's relocation to Cape Cod. Carlson did not learn of this fact until receipt of the July 18 anonymous letter.

A0004267.DOC 9

NIED, the cutting off of benefits is no different than the mere termination itself, which alone is not enough to state a claim for NIED."

While this Court concluded its discussion on this issue with the statement that "none of these incidents . . . is extreme or outrageous," and while plaintiff is correct that proof of "extreme or outrageous" is not required in an action for NIED, this Court's decision did not turn on a finding of "extreme or outrageous." Again, this Court's ruling was correctly based on the proper standard for NIED, under Parsons and Perodeau, which turns on specific elements of reasonable foreseeability.

In short, it was not reasonably forseeable as a matter of law that the letter sent to plaintiff, which merely informed him of the decision to terminate his employment, would create an "unreasonable risk of causing emotional distress" resulting in illness or bodily harm, Perodeau, 259 Conn. at 571, as there were no aggravating circumstances in the manner in which this termination was carried out. Accordingly, summary judgment was appropriate in view of the rule of law properly relied on by this Court in its ruling at pages 33-34:  "The mere termination of employment, even where it is wrongful, is not by itself sufficient to sustain a claim for [NIED]," citing Parsons, 243 Conn. at 88-89.

Respectfully submitted, this ___ day of February, 2005.

SHEA STOKES CARTER, ALC

KARL M. TERRELL
Court Bar No. ct23614
Georgia Bar No. 702265
*Admitted Pro Hac Vice*

3593 Hemphill Street
Post Office Box 87468
Atlanta, GA 30337
404.766.0076 (Telephone)
4044.766.8823 (Facsimile)

A0004267.DOC

11

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROBERT WORSTER, | ) |
| | ) |
| Plaintiff, Defendant-in-Counterclaim, | ) |
| | ) |
| v. | ) Case No.: 302CV167(EBB) |
| | ) |
| CARLSON WAGONLIT TRAVEL, INC., | ) |
| | ) |
| Defendant, Plaintiff-in-Counterclaim. | ) |

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing Defendant's Opposition to Plaintiff's Motion for Reconsideration upon counsel of record by depositing a true and correct copy of same with the United States Postal Service, postage prepaid and addressed as follows:

Deborah McKenna, Esq.
Livingston, Adler, Pulda & Meikejo
557 Prospect Avenue
Hartford, CT 06105-2922

This 2 day of February, 2005.

_____
KARL M. TERRELL

A0004267.DOC              12