```
                 UNITED STATES DISTRICT COURT
                   DISTRICT OF CONNECTICUT

ROBERT WORSTER                   :
        Plaintiff                :
                                 :
     v.                          :  NO. 3:02CV167(EBB)
                                 :
CARLSON WAGONLIT TRAVEL, INC.    :
        Defendant                :
```

## RULING ON MOTION FOR RECONSIDERATION

Plaintiff Robert Worster ("Worster") has moved for reconsideration of the court's ruling granting summary judgment to Carlson Wagonlit Travel, Inc. ("Carlson") [Doc. No. 33] on Count Four, alleging retaliation under the Family Medical Leave Act ("FMLA"), and Count Five, alleging negligent infliction of emotional distress, of the complaint. Plaintiff claims that the court committed clear errors of law in granting summary judgment on these counts and refers the court to new Connecticut authority on the standard for negligent infliction of emotional distress.

Plaintiff first claims that, in light of 29 C.F.R. § 825.312(h),[1] the court was in error when it held that Carlson's

---

[1] Title 29, Code of Federal Regulations, Section 825.312(h) states:
  "If the employer has a uniformly-applied policy governing outside or supplemental employment, such a policy may continue to apply to an employee while on FMLA leave. An employer which does not have such a policy may not deny benefits to which an employee is entitled under FMLA on this basis unless the FMLA leave was fraudulently obtained as in paragraph (g) of this section." 29 C.F.R. § 825.312(h).
  Paragraph (g) states:
  "An employee who fraudulently obtains FMLA leave from an employer is not protected by FMLA's job restoration or maintenance of health benefits provisions." 29 C.F.R. § 825.312(g).

termination of his employment while he was out on FMLA leave did not violate his rights under the FMLA. Plaintiff contends that Carlson could not enforce its policy prohibiting outside or supplemental employment against him while on full-time FMLA leave because § 825.312(h) only allows any such policy to continue to apply to an employee on FMLA leave if it is "uniformly-applied." Defendant, Plaintiff contends, did not uniformly apply its policy, as it did not prohibit him from working a second job while he was on intermittent FMLA leave, and yet fired him for working such a job while on full-time FMLA leave.

Plaintiff's argument is that, because the regulation makes no distinction between full-time and intermittent FMLA leave, it follows that a policy that is only applied to those on full-time leave and not to those on intermittent leave is not "uniformly-applied" under 29 C.F.R. § 825.312(h). Therefore, Plaintiff argues, the Defendant's articulated reason for its termination of Plaintiff, that he was in violation of the company's FMLA leave policy, was itself violative of the FMLA, and could not have been a legitimate, non-discriminatory reason for its adverse employment action under the McDonnell-Douglas burden-shifting analysis. This court is not persuaded. The regulation does not differentiate between intermittent and full-time FMLA leave, but neither does it proscribe an employer from making such a

2

distinction and then applying it uniformly.  See also Wage and Hour Div., United States Dep't of Labor, Op. Letter, FMLA, 1999 WL 1002422 (noting that "neither the statute nor regulations prohibit outside employment by an employee on FMLA leave except as a result of the employer's established policies").  Plaintiff signed the Notice to Employee of Rights and Obligations under the Family Medical Leave Act ("Notice of Rights") on May 18, 2000, shortly after beginning his full-time FMLA leave, attesting that he had read and understood the document, including paragraph 17, which explicitly prohibited gainful employment.[2]  Here, as this court opined in its Memorandum of Decision on Motion for Summary Judgment ("Memorandum of Decision") [Doc. No. 33], Plaintiff has put forth no evidence that Defendant allowed other employees to engage in outside or secondary employment while on full-time FMLA leave, nor has Plaintiff put forth any evidence that Defendant had a policy prohibiting outside or supplemental employment while on intermittent FMLA leave.  Yet, Plaintiff concludes that "Carlson's policies made no clear differentiation between the two types of leave."[3]  Plaintiff's Reply to Defendant's Opposition to

---

[2] "17.  You must not engage in gainful employment during FMLOA.  Noncompliance with this restriction, or fraud in obtaining an FMLOA will result in termination of employment in addition to other rights of the Company if that occurs (including potential recovery of the Company's share of health or dental insurance premiums during FMLOA to the extend not prohibited by law)."
[3] Plaintiff contends that he told Defendant he was working at a restaurant part-time while taking intermittent FMLA leave and was not asked to end such employment, evincing a non-uniformly applied policy.  Defendant asserts that its policy against outside or supplemental work only applies to a full-time

the Plaintiff's Motion for Reconsideration ("Plaintiff's Reply") at 2. Plaintiff further contends that, "the very FMLA form that the plaintiff signed at the outset of his full-time FMLA leave. . . contains specific reference to intermittent FMLA, including identification of the specific dates and duration of the intermittent leave." Plaintiff's Reply at 2-3. There is no specific reference to Plaintiff's intermittent leave in the Notice of Rights signed by Plaintiff on May 18, 2000.[4] See Defendant's Exh. 21 in Support of Mot. for Summary Judgment. Furthermore, Defendant asserts that Plaintiff was not required to sign the Notice of Rights upon being granted intermittent leave. See Defendant's Opposition to Plaintiff's Motion for Reconsideration ("Defendant's Opposition") at 2. Plaintiff has not put forth any evidence to counter this assertion, other than speculation and conjecture that the Notice of Rights "is presumably the same form that the Plaintiff signed at the outset of his intermittent leave."[5] The parties do not dispute that

---

FMLA leave of absence, and that Defendant told Plaintiff that if they found that his night job was the cause of his fatigue, he would not be eligible for intermittent FMLA leave.

[4] Page 1 of the Notice of Rights form reads, in pertinent part:
    You have notified us that your leave will commence 5/12/00, and that you expect it to continue until 7/6/00. If your leave is an intermittent leave or based on a reduced leave schedule, you have also described your leave as follows:
    N/A
Defendant's Exh. 21 in Support of Mot. to Dismiss.

[5] In support of such conjecture, Plaintiff first states, in a footnote to his Reply, that "[t]he fact that the parties have been unable to locate a similar form for the plaintiff's intermittent leave simply does not prove that the requirements were any different, despite the defendant's suggestion

4

Plaintiff signed the Notice of Rights form on May 18, 2000, which detailed the rights and obligations of both Plaintiff and Defendant specifically with regard to the full-time leave of absence Plaintiff requested for the period May 12, 2000 through July 7, 2000.  Plaintiff has produced no evidence that negates the requirement of paragraph 17 of that form that he "not engage in gainful employment during FMLOA."  The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indust. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

Furthermore, an employee may be terminated while on FMLA leave, as long as the taking of the leave did not precipitate the termination.  Geromanos v. Columbia Univ., 322 F. Supp. 2d 420, 428 (S.D.N.Y. 2004).   In Pharakhone v. Nissan North America, Inc., 324 F.3d 405 (6th Cir. 2003), the Plaintiff requested FMLA leave for the birth of his child and to help manage a restaurant his wife had recently purchased.  Nissan's employee handbook contained a provision prohibiting unauthorized work while on FMLA leave, and Plaintiff was told explicitly by Nissan that company policy prohibited him from working in the restaurant while on

---

otherwise."  In further support, Plaintiff states, in reference to Defendant's Exh. 21, "[t]his is presumably the same form that the Plaintiff signed at the outset of his intermittent leave and a reiteration of the same policy that applied to that leave."  Letter from Plaintiff's Counsel, Deborah L. McKenna, to the Court (June 28, 2005).

leave.  Id. at 406-07.  Nonetheless, Plaintiff worked part-time while on FMLA leave, and was subsequently terminated by Nissan for violating company policy.  Id.  In rejecting Plaintiff's appeal of summary judgment for the Defendants, the Sixth Circuit held that "an employer need not reinstate an employee if application of a uniformly-applied policy governing outside or supplemental employment – i.e. a rule against working while on leave – results in the employee's discharge."  Id. at 408 (internal quotation marks and citations omitted).  "[W]hether an employer violates the FMLA turns on why the employee was not reinstated."  Id. (citation omitted).  "If the employee cannot show that he was discharged because he took leave – or at least that his taking of leave was a 'negative factor' in the employer's decision to discharge him – he cannot show a violation of the FMLA."  Id.

Here, Plaintiff contends that he offered substantial evidence to demonstrate that his FMLA leave was not fraudulently obtained, including a certification signed by his doctor supporting his need for FMLA leave that stated, among other things, "when fatigued unable to work."  Defendant's Exh. 18 in Support of Mot. for Summary Judgment.  Plaintiff argues that there is nothing inconsistent or deceptive in his continuing, therefore, to work in a restaurant when he was able to do so.

6

However, an employer who honestly believes that it is terminating an employee who obtained FMLA leave fraudulently will not be liable even if the employer is mistaken in its belief. Medley v. Polk Co., 260 F.3d 1202, 1207 (10th Cir. 2001); Kariotis v. Navistar Int'l Transp. Corp., 131 F.3d 672 (7th Cir. 1997). In Kariotis, the Seventh Circuit held that, although Navistar was careless in its investigation of Plaintiff's health status during her FMLA leave for knee surgery, basing its decision primarily upon evidence gathered by a company hired to videotape her activities while out on leave, and never consulting with her physician, the employer's honest belief that Kariotis was not using her FMLA leave for its "intended purpose" under 29 U.S.C. 2614(a)(1)[6] – recovery from her surgery – defeated her claims of discrimination.[7] Id. at 679-81.

Here, the medical certification submitted by Plaintiff to support his request for FMLA leave described an individual who

---

[6] § 2614.  Employment and benefits protection
(a) Restoration to position
(1) In general
     Except as provided in subsection (b) of this section, any eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave –
     (A) to be restored by the employer to the position of employment held by the employee when the leave commenced.  29 U.S.C. § 2614(a)(1)(A).

[7] "Navistar need not conclusively prove that Kariotis had misused her leave; an honest suspicion will do.  This is because the FMLA's regulations plainly state that an employee like Kariotis has 'no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period.'  29 C.F.R. 825.216(a). In other words, because Navistar lawfully could have terminated Kariotis after suspecting she committed fraud while on duty, the company can discharge her after suspecting she committed fraud while on leave."  131 F.3d at 681.

was unable to work.[8]  It stated that Plaintiff was presently incapacitated due to extreme fatigue, and that Plaintiff was unable to perform work of any kind.  Carlson contends that, after receiving the anonymous facsimile letter stating, *inter alia*, that Plaintiff was "working at a restaurant called Chester's in Provincetown sporting a nice tan," and then calling Chester's anonymously on two occasions and being told Plaintiff would be in later, it believed that Plaintiff was not taking leave under section 2612 "for the intended purpose of the leave."  29 U.S.C. § 2614(a)(1)(A).

Furthermore, when Human Resources was contacted by the investigator from the Connecticut Commission on Human Rights and Opportunities ("CCHRO") regarding Plaintiff's CCHRO claims, the investigator said that, from what Plaintiff told him, Plaintiff "was so severely disabled that he can't work at all." Defendant's Exh. 29.[9]

There is no evidence in the record that would support a finding that Carlson terminated Plaintiff in violation of his

---

[8] In that doctor's certificate, in response to question 6(c), "state whether the patient is presently incapacitated", Plaintiff's physician responded "Yes, due to extreme fatigue."  Defendant's Exh. 18.  In response to question 8(a), "If medical leave is required . . . is the employee unable to perform work of any kind?", Plaintiff's physician responded "Yes."  Id.  However, in contradiction, in response to 8(b), "If able to perform some work, is the employee unable to perform one or more of the essential functions of the employee's job . . .?, Plaintiff's physician responded "Yes" again, and stated "When fatigued, unable to work." Defendant's Exh. 18.

[9] Indeed, at his deposition Plaintiff was shown work records from Chester's and did not deny that he was working 60 or more hours over a number of two-week periods during the two months or more he was out on FMLA leave.

8

rights under the FMLA.  Carlson believed that Plaintiff was being deceptive in taking FMLA leave, and was not taking the leave for its intended purpose.  "[A] reason honestly described but poorly founded is not a pretext as that term is used in the law of discrimination."  <u>Kariotis</u>, 131 F.3d at 677.  While its investigation may have left something to be desired, "[n]o matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the laws barring discrimination do not interfere." <u>Id.</u> at 678.

Plaintiff also claims that the court committed a clear error of law in granting summary judgment in favor of Carlson on Plaintiff's negligent infliction of emotional distress ("NIED") claim.  Plaintiff draws the court's attention to a recent case from the Connecticut Appellate Court, <u>Olson v. Bristol-Burlington Health Dist.</u>, 87 Conn. App. 1, 863 A.2d 748 (Conn. App. Ct. 2005), which, Plaintiff asserts, changed Connecticut law regarding claims of NIED.

Plaintiff is correct that, under Connecticut law, a showing of "extreme and outrageous behavior" is not required to establish NIED, and this court erred in referring to the "extreme and outrageous" standard in citing <u>Miner v. Town of Cheshire</u>, 126 F. Supp. 2d 184, 197 (D.Conn. 2000) in the Memorandum of Decision.  However, <u>Olson</u> did not change Connecticut law as it is applied to

NIED claims; it merely reiterated the standard as developed under Connecticut law: to state a claim for negligent infliction of emotional distress, a Plaintiff must prove that Defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress, and that the distress, if caused, might result in illness or bodily harm. See, e.g., Carroll v. Allstate Ins. Co., 262 Conn. 433, 446-47, 815 A.2d 119 (2003); Perodeau v. City of Hartford, 259 Conn. 729, 751, 792 A.2d 752 (2002); Parsons v. United Technologies Corp., 243 Conn. 66, 88-89, 700 A.2d 655 (1997); Barrett v. Danbury Hospital, 232 Conn. 242, 260-61, 654 A.2d 748 (1995); Montinieri v. Southern New England Tel. Co., 175 Conn. 337, 345, 398 A.2d 1180 (1978).

Furthermore, as is evident from this court's Memorandum of Decision, the court's analysis of Plaintiff's NIED claim was not based upon Miner; rather, the court's reasoning was based on the standard above, developed under Connecticut law. As this court stated:

> In the employment context, NIED arises only where it is based upon the defendant's unreasonable conduct in the termination process. See Parsons v. United Tech. Corp., 243 Conn. 66, 89, 700 A.2d 655 (1997). The dispositive issue is whether the employer's conduct 'was sufficiently wrongful that [it] should have realized that its conduct involved an unreasonable risk of causing emotional distress,' which could result in illness or bodily harm. Perodeau v. City of Hartford, 259 Conn. 729, 751, 792 A.2d 752 (2002).

Memorandum of Decision at 33.

Analyzing Plaintiff's claim under this standard, this court found that even when viewed in the light most favorable to Plaintiff, the facts do not support a claim for NIED.

Here, Plaintiff argues that the following actions by Defendant were sufficiently wrongful to create an unreasonable risk of causing emotional distress: 1) sending the termination letter to Plaintiff at Chester's restaurant; 2) including accusations of deceitful conduct in that letter; 3) failing to send the termination letter to Plaintiff's home address; and 4) cutting off Plaintiff's health insurance benefits within two months of learning of his HIV-positive status.

The "mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior," Parsons, 243 Conn. at 88-89 (internal quotations and citation omitted), and therefore, mere termination of employment, by itself, is not enough to sustain a claim for negligent infliction of emotional distress. Id. at 89. In order for this court to find Defendant's conduct unreasonable, Plaintiff must prove that the termination of his employment by Defendant was done in an "inconsiderate, humiliating or embarrassing manner." Yurevich v. Sikorsky Aircraft Div., 51 F. Supp. 2d 144, 153. (D.Conn. 1999). Accord Sizer v. Connecticut Post, 2004 WL 114457, at *4 (Conn. Super. Jan. 9, 2004); Pavliscak v.

11

Bridgeport Hosp., 48 Conn. App. 580, 598, 711 A.2d 747, *cert. denied*, 245 Conn. 911, 718 A.2d 17 (1998) (finding no support as a matter of law for the jury's finding of NIED where there was no evidence the Defendant humiliated the Plaintiff publicly but only terminated the Plaintiff without advance warning).

In Olson, the Plaintiff was suffering from multiple sclerosis, and had admitted to cognitive difficulties that impaired her ability to perform her job. 87 Conn. App. at 3. During the course of her termination, she was accused of falsifying medical records, egregious misconduct and deliberate indifference to those under her care. Id. There the court found such actions rose to the level of NIED to survive a motion to strike. Id. And, in Edwards v. Cmty. Enter., Plaintiff's claim for NIED survived summary judgment because the court found that the manner of Plaintiff's termination was unreasonable where she worked as a live-in assistant and was recovering from pneumonia when the employer terminated her, gave her 48 hours notice to vacate the residence and threatened to have the police evict her. 251 F. Supp. 2d 1089, 1105 (D.Conn. 2003).

Plaintiff has put forth no evidence that his termination was carried out in an inconsiderate, embarrassing, humiliating or otherwise unreasonable manner. The anonymous facsimile letter was received on July 18, 2000. Carlson's telephone calls to

12

Chester's restaurant were made anonymously. On July 19, 2000 Worster left a telephone message for Jo-Ann House, stating "this is my income, and I am . . . you know, an ill person." Upon believing that they were being deceived about Plaintiff's need for FMLA leave, Carlson decided to terminate Plaintiff, and on July 25, 2000, addressed the termination letter to Plaintiff using the address for Chester's restaurant.[10] In that letter, Jo-Ann House reminded Plaintiff that his representations to the company were that he was too ill to work, and House conveyed her disappointment to learn that Plaintiff was deceiving Carlson. During his deposition, Plaintiff admitted that he was working 74.75 or more hours during a two week pay period at Chester's restaurant in Cape Cod while out on FMLA leave, and 66.75 hours during another two-week pay period in July of 2000. Finally, Plaintiff tested HIV positive in March of 2000, and his benefits and employment were terminated approximately 4 months later, effective July 25, 2000. As this court held in its Memorandum of Decision, terminating Plaintiff's health benefits is akin to the termination of Plaintiff's employment, which alone is not enough to state a claim for NIED.

While the fact that Plaintiff was terminated may be a source

---

[10] Carlson knew that Plaintiff was working in Cape Cod, and needed to communicate to him its decision to terminate him. It would seem that the most expeditious manner to have done so was to send the termination letter to him at the only Cape Cod address Defendant had for him.

13

of anxiety, shame or embarrassment, nothing in the facts indicates that Defendant's actions in the termination process created an unreasonable risk of emotional distress. This court is not persuaded that the manner of the termination itself was so unreasonable as to rise to the level of negligent infliction of emotional distress.

Accordingly, the Motion for Reconsideration [Doc. No. 37] is granted but the relief requested is denied.

                              SO ORDERED.

                              _____
                              ELLEN BREE BURNS, SENIOR JUDGE
                              UNITED STATES DISTRICT COURT

Dated at New Haven, CT, this ____ day of July, 2005.